**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEALY L. SKELDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:25-cv-06078 |
| v. | ) | |
| | ) | District Judge Joan B. Gottschall |
| DERMACARE USA Corporation d/b/a | ) | |
| DERMACONCEPTS | ) | Magistrate Judge Jeffrey T. Gilbert |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Nealy L. Skeldon, by and through her attorneys at Williams, Bax & Saltzman, P.C., amends her Complaint and alleges as follows against Defendant DermaCare USA Corporation d/b/a DermaConcepts:

1. Skeldon worked as a Regional Account Manager employee for DermaCare from June 2013 through March 31, 2025.

2. Skeldon's principal sales territory included all of Illinois, Wisconsin, and Minnesota.

3. Throughout her employment with DermaCare, Skeldon was a citizen of the State of Illinois and she worked for DermaCare in Illinois.

4. Skeldon is a citizen of the State of Illinois.

5. DermaCare is a Massachusetts corporation that conducts substantial business in Illinois.

6. Venue is proper in this Court under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is diversity of citizenship.

**Facts Common to All Counts**

7. On May 6, 2013, DermaCare extended a formal employment contract to Skeldon, offering her the position of Regional Account Manager and specifying that her compensation would include a base salary, a tiered commission structure based on her monthly sales, a bonus

for each new client account, and additional bonuses for specific sales milestones.  *See* **Exhibit A**, May 6, 2013 Employment Contract.

8.   Also on May 6, 2013, DermaCare required Skeldon to sign a Non-Solicitation and Non-Competition Agreement as a condition of her employment.  *See* **Exhibit B**, May 6, 2013 Non-Solicitation and Non-Competition Agreement.

9.   At all times relevant to the Complaint, Robert Lewis Trow was the President and/or Owner of DermaCare.

10. At all times relevant to the Complaint, Carol Smira Trow was the Owner and/or executive of DermaCare.

11. At all times relevant to the Complaint, Michael Lucich was the Controller and/or General Manager of DermaCare.

12. At all times relevant to the Complaint, Brittany Pike was the Director of Sales Operations of DermaCare.

13. In early 2022, Skeldon was identified as a witness to Title VII violations in a lawsuit filed against DermaCare by another employee.  Skeldon had no knowledge that she was being identified as a witness in that federal lawsuit.

14. Skeldon experienced emotional distress as a result of DermaCare's actions.

### Facts Common to Counts II and III (Breach of Contract and Illinois Wage Payment and Collections Act Violations and Retaliation)

### I.   DermaCare's Improper Denial of Reimbursement for Legitimate Business Expenses

15. Beginning in or around July of 2022, DermaCare began denying Ms. Skeldon's legitimate business expense reimbursements, including client entertainment, travel expenses, and marketing materials.

16. Many of the business expenses referenced in Paragraph 15 were made pursuant to Company management's direction, or DermaCare's Standard Operating Procedure, but were nonetheless denied for the first time in years.

17. During the same time period, DermaCare approved other employees' comparable business expenses and in some cases much more extensive reimbursements, such as DermaCare employee Carrie Dodson's personal and family travel expenses.

18. Ms. Skeldon was forced to use her personal money to pay for reimbursable business expenses, amounting to thousands of dollars of expenses.

## II. DermaCare's Improper Deductions from Skeldon's Sales Totals for Client Hotel Fees and Shipping Expenses, Resulting In Lost Commission

19. When Dermacare reimbursed clients for hotel expenses related to training events, DermaCare would deduct these hotel expenses from Skeldon's monthly sales totals.

20. Additionally, DermaCare improperly deducted shipping charges from Skeldon's sales totals.

21. In total, DermaCare improperly deducted $14,376.32 from Skeldon's sales totals, resulting in the loss of $1,346.73 commissions.

22. Skeldon did not agree to these deductions from her commission, or authorize them in writing.

23. DermaCare had no legal basis to make these hotel fee or shipping fee deductions from Skeldon's commission.

24. DermaCare should have been responsible for these hotel and shipping fees as marketing expenses.

### III.     DermaCare's Purposeful Miscalculation of New Account Bonuses

25. In October of 2023, Skeldon discovered that Lucich had been underpaying her non-discretionary New Account Bonuses by manipulating the formulas used to calculate the earned bonuses.

26. Instead of deducting commissions at the contractually specified base rate of 6.5%, Lucich was applying a 10% deduction rate that resulted in a smaller bonus payout.

27. Lucich's deliberate miscalculation of Skeldon's bonuses constitutes wage theft.

28. Skeldon discovered that she was underpaid for the following New Account bonuses that she generated: $4,000 for the Forever Young Med Spa account; $948.82 for the SpaDerma account; and $1,062.22 for the AST account.

29. Skeldon complained and was able to force Lucich to correct the bonus underpayment errors noted in paragraph 28, related to underpayments in 2023, but only after a multitude of tense emails with Lucich.

30.    When Skeldon requested that Lucich review, or allow Skeldon to review, the 2021 and 2022 bonus calculations for similar errors, Lucich retaliated and refused to investigate or allow Skeldon to investigate, and ceased all communication on the topic.

31. Additionally, under Skeldon's employment agreement she was entitled to a nondiscretionary $250.00 bonus for every new client account with a minimum order of $1,500. *See* **Exhibit A**.

32. Skeldon calculated that between 2014-2025, she opened at least 89 qualifying new accounts for which DermaCare did not pay her the $250.00 bonus, totaling $22,250.00 of unpaid bonuses.

### IV. DermaCare's Purposeful Miscalculation and Denial of Annual Growth Bonuses

33. In 2022, DermaConcepts made intentional operational errors so that a number of sales were not credited to Skeldon's account, thereby depressing her apparent record sales totals and excluding Skeldon from the Growth Bonus.

34. Skeldon identified the errors and requested that her sales totals be corrected, but DermaCare refused to correct the errors.

35. Additionally, DermaCare improperly calculated Skeldon's Growth Bonuses in 2021, 2022, and 2023.

36. DermaCare's Growth Bonus plans explicitly stated that growth bonus calculations should be based on product sales only, excluding device sales.

37. But DermaCare improperly included device sales in Skeldon's growth targets, thus artificially inflating the targets and making them harder to achieve.

38. Using the correct calculation of product sales for both the base year and the performance year, Skeldon should have been paid growth bonuses of: $9,949.15 in 2021; $2,465.47 in 2022; and $4,450.64 in 2023.

39. Altogether, Skeldon was damaged $16,865.26 of unpaid growth bonuses between 2021-2023.

### V. DermaCare's Disparate Treatment of Partnership Program Leads

40. Skeldon established a lucrative partnership between DermaCare and the American Med Spa Association ("AmSpa") in 2015, creating national lead generation of sales.

41. But DermaCare restricted Skeldon so that she could only handle leads from AmSpa within her assigned territory, as part of its retaliation against her.

42. Meanwhile, DermaCare allowed a comparable employee to handle nationwide leads in a similar partnership that she established. Specifically, DermaCare's Seattle Business

Development Manager, Kristin Louise Sabin, was allowed to handle nationwide leads regarding a partnership that Sabin established with Lori Crete.

43. Once the leads become accounts through placing an opening order, Ms. Sabin receives a sizeable commission on the order, then the account is handed over to the local representative.

44. Skeldon requested the same treatment that DermaCare extended to Sabin, but DermaCare refused to allow Skeldon to handle nationwide leads from AmSpa.

45. DermaCare's decision to deny allowing Skeldon to handle nationwide leads from AmSpa diminished Skeldon's commission opportunities over the course of several years.

### VI.    DermaCare's Gratis Program Error

46. In November 2023, DermaCare erroneously applied its gratis (free product) program to already discounted Holiday Kits, in violation of the program's own terms, and in retaliation for Skeldon's complaints.

47. This error resulted in Skeldon losing sales of approximately $5,500 and commissions from the Holiday Kits.

48. When Skeldon identified the error and requested compensation for the lost commissions, DermaCare refused to compensate her for the resulting losses.

### VII.   DermaCare's Baseless Performance Criticism/Gaslighting and Disproportionately High Sales Goals for Skeldon in 2025

49. From July 2022 through February of 2025, Rob Trow began providing regular feedback to Skeldon indicating that she was failing to meet sales metrics and performing worse than her peers.

50. Rob Trow's comments were knowingly false, made in bad faith in retaliation for Skeldon's complaints.

51. Circa July 22, 2022, Rob Trow emailed Skeldon and admonished her for "negative [sales] growth."

52. Rob Trow's allegation of negative growth was demonstrably false, as Skeldon's product sales through the end of June 2022 showed positive growth of 5.39% ($283,769.70 in 2022, compared to $269,255.20) from the prior year.

53. In June of 2024, Rob Trow emailed Skeldon and alleged that she was not "keep[ing] pace with the rest of the sales staff."

54. Rob Trow's allegation was false, as all or nearly all DermaCare sales staff were experiencing negative revenue trends during that period in 2024, and Skeldon's sales decline was among the least severe of all sales staff.

55. Rob Trow additionally sent private messages and memes to Skeldon's personal social media accounts, reinforcing that she was in disfavor with him and accusing her of having "negativity" and "attitude."

56. Carol Trow called Skeldon in 2024 to reprimand Skeldon for noncompliance with Standard Operating Procedures.

57. During that call, Carol Trow did not allow Skeldon to explain the facts of what happened.

58. Skeldon had in fact complied with DermaCare's Standard Operating Procedures regarding the incident that Carol Trow called her about, but Carol Trow never acknowledged that her reprimand was wrong or that Skeldon had behaved appropriately.

59. In February of 2025, in retaliation for Skeldon's complaints, Pike provided 2025 sales expectations for Skeldon that were disproportionately aggressive and unrealistic, both compared to the sales goals set for the other Business Development Managers, and also compared to sales expectations in Skeldon's previous eleven years with DermaCare.

60. The 2025 sales expectations did not adequately account for the historical performance of Skeldon's territory or prevailing market conditions.

61. The sales expectations Pike relayed to Skeldon in 2025 were designed to set Skeldon up for failure as part of the retaliatory scheme.

**VIII.    DermaCare's Failure to Pay Skeldon's Earned Vacation Time**

62. DermaCare offers paid vacation time at the employee's regular rate of pay.

63. When Skeldon separated from DermaCare on March 31, 2025, she had accrued 340.74 hours of unused vacation time.

64. Given Skeldon's hourly rate of $36.97, her accrued vacation time amounted to $12,597.53 in earned wages.

65. DermaCare failed to pay Skeldon these earned wages as final compensation, upon her separation from employment.

**Count I: Declaratory Judgment Regarding**
**Unenforceability of the Non-Competition Agreement**

66. Skeldon realleges and restates Paragraphs 1-14 of this Complaint as though fully restated here in their entirety.

67. Prior to joining DermaCare, Skeldon worked in the aesthetics industry for more than nine years.

68. On or about May 6, 2013, Skeldon signed a "Non-Solicitation and Non-Competition Agreement," (the "Agreement") with DermaCare.  *See* **Exhibit B**.

69. As consideration, DermaCare offered $1,000 and employment with DermaCare.

70. The Agreement has no geographical limits.

71. For two years after Skeldon's departure from DermaCare, the Agreement would prevent Skeldon from rendering services:

**directly or indirectly**, to any third party to which **the Company** has provided products or services within the twelve (12) months prior to termination of Employee's employment with the Company, nor to any third party **prospective clients** of the Company with whom the Company was in meaningful negotiations for providing the Company's products or services at the time of the termination of Employee's employment with the Company."

8

[emphasis added] *See* **Exhibit B**, Para. 1.(b).

72. The limitations identified in Paragraph 71 would apply even if Skeldon had never worked or had contact with these parties, even if she did not know that DermaCare considered these individuals or business to be prospective clients, and even if DermaCare did not successfully contract with these prospective clients. Notably, these restrictions are not even limited to DermaCare's industry, or to Skeldon providing services that are in competition with DermaCare— they would prevent Skeldon from providing any types of services to these parties or prospective clients.

73. Likewise, for two years after Skeldon's departure from DermaCare, the Agreement would prevent Skeldon from soliciting:

> any business with any customer or account with which Employee had **any** contact or association, which was under the supervision of the Employee, **or the identity of which was learned** by Employee as a result of Employee's association with the Company. . .

[emphasis added] *See* **Exhibit B**, para. 1.(c).

74. The prohibition identified in Paragraph 73 is not limited in time to customers with whom Skeldon recently worked, or even to customers that Skeldon ever worked with in her twelve-year history with DermaCare. Likewise, it is not limited to current customers of DermaCare, but could extend to any prior customers that DermaCare has had in its history. Neither is it limited by Skeldon's substantive involvement with the customer. Moreover, even if Skeldon did not know any details about the customer's business with DermaCare, such as specific products purchased or rates, simply learning the identity of the customer would prohibit Skeldon from soliciting that customer.

75. DermaCare did not enforce the Agreement against another former employee, Bobby Calhoun, who left DermaCare in 2024 to work in medical aesthetics. However, DermaCare represented to Skeldon that DermaCare intends to specifically enforce the Agreement against her.

76. Skeldon has experienced ongoing harm by this selective enforcement of the Agreement against her. After separating from DermaCare, Skeldon found employment as a Regional Sales Manager with a company that sells medical-grade skincare products. In her new position, she was assigned sales territory on the south side of Chicago, from North Avenue south through the south and southwestern suburbs. She cannot fully perform her current job duties, including utilizing her professional contacts, under the Agreement's constraints.

77. If the Agreement is not deemed unenforceable, Skeldon may lose her current position for failure to meet reasonable sales goals.

78. Illinois courts consider restrictive covenants reasonable "only if the covenant: (1) is no greater than is required for the protection of legitimate business interest of the employer-promisee (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *See Reliable Fire Equip. Co. v. Arredondo*, 358 Ill.Dec. 322, 965 N.E.2d 393, 396 (Ill. 2011). For the reasons stated above, the Agreement at issue here is unreasonable and therefore unenforceable, because it is both overbroad and it imposes an undue hardship on Skeldon.

WHEREFORE, Skeldon respectfully requests judgment in her favor and against the Defendant, including:

    i.    Declare that the May 6, 2013 Non-Solicitation and Non-Competition Agreement is void, unenforceable, and contrary to Illinois law and public policy;

    ii.    Permanently enjoin DermaCare from attempting to enforce or asserting any rights under the Agreement;

    iii.    Award Ms. Skeldon her costs and reasonable attorneys' fees incurred in bringing this action;

    iv.    Award emotional distress damages; and

    v.    Grant such other and further relief as this Court deems just and proper.

## Count II: Breach of Contract

79. Skeldon realleges and restates Paragraphs 1-65 of this Complaint as though fully restated here in their entirety.

80. Skeldon fully performed her obligations under the employment contract she entered into with Dermacare, **Exhibit A**.

81. DermaCare materially breached the employment contract by: failing to pay New Account Bonuses for 89 qualifying accounts (totaling $22,250); improperly calculating and underpaying Growth Bonuses for 2021-2023 (totaling $16,865.26); making unauthorized deductions from total sales (amounting to $1,346.7 dollars in lost commissions); refusing to reimburse legitimate business expenses (totaling thousands of dollars); and failing to pay accrued vacation upon separation (totaling $12,597.53).

WHEREFORE, Skeldon respectfully requests judgment in her favor and the following relief:

  i.    Award all damages for breach of contract;

  ii.   Award Skeldon's costs and attorneys' fees; and

  iii.  Grant such other and further relief as this Court deems just and proper.

## Count III: Violation of and Retaliation
## Under the Illinois Wage Payment and Collection Act

82. Skeldon realleges and restates Paragraphs 1-65 of this Complaint as though fully restated here in their entirety.

83. At all relevant times, Skeldon was an employee of DermaCare within the meaning of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1, *et seq.*, operating under a valid employment contract, **Exhibit A**.

84. Defendant failed to pay Skeldon her due wages under the IWPCA, including:

  a.  New Account Bonuses for at least 89 qualifying accounts between 2014 and 2025, totaling $22,250;
  b.  Growth Bonuses, totaling $16,865.26 between 2021-2023; and

      c.   Accrued vacation hours, totaling $12,597.53.

85. Additionally, Defendant wrongly deducted $14,376.32 from Skeldon's sales totals for hotel and mailing costs, costing Skeldon $1,346.73 in unpaid commissions.

86. Finally, Defendant failed to reimburse Skeldon for all necessary expenditures or losses incurred by Skeldon within the scope of her employment and directly related to services performed for the employer. These necessary expenditures included client entertainment, travel expenses, and marketing materials, and overall cost approximately $3,000.

87. Defendant willfully refused to pay Skeldon as provided by the IWPCA, and falsely denied the amount or validity of the amounts owed to Skeldon.

88. Additionally, DermaCare retaliated against Skeldon with baseless criticism and disproportionately high sales goals compared to other comparable employees, as well as through materially adverse employment actions impacting Skeldon's current and future wealth, such as disallowing Skeldon from gaining sales leads outside of her assigned territory for the national AmSpa partnership that she generated, erroneously marketing holiday discounted items as free goods and depriving her of approximately $5,500 sales commissions, reducing her commissions to pay fees that DermaCare was responsible for, and failing to reimburse her for legitimate business expenses.

WHEREFORE, Skeldon respectfully requests judgment in her favor, including:

    i.    Award all damages for violation of the IWPCA;

   ii.    Costs and reasonable attorney's fees;

  iii.    Penalties under the IWPCA;

  iv.    Emotional Distress Damages;

   v.    All legal and equitable relief as may be appropriate; and

  vi.    Grant such other and further relief as this Court deems just and proper.

## Count IV: Violation of the Illinois Right of Publicity Act

89. Skeldon realleges and restates Paragraphs 1-14 of this Complaint as though fully restated here in their entirety.

90. The Illinois Right of Publicity Act, 765 ILCS 1075/1, *et seq.*, prohibits the use of an individual's identity (including any attribute that identifies that individual to an ordinary viewer, including the individual's name, signature, or photograph) for commercial purposes, without written consent.

91. Following Skeldon's separation on March 31, 2025, DermaCare continued to use her name and identity in commercial marketing communications, promoting its products and services.

92. DermaCare sent multiple marketing emails from "Nealy Skeldon," including using her former email address as the "Reply-To" address. On information and belief, these emails were sent to more than 100 industry leaders.

93. Skeldon is aware of specific emails that were sent on April 9, 2025, April 16, 2025, April 23, 2025, April 30, 2025, May 7, 2025.

94. Skeldon did not provide written consent for DermaCare's continued use of her identity.

95. DermaCare's use of Skeldon's identity implied that Skeldon continued to endorse DermaCare and had a continued association with them.

96. Under 765 ILCS 107/40, Skeldon is entitled to the greater of actual damages or $1,000 per violation.

97. Skeldon provided formal notice on May 9, 2025, that she wanted DermaCare to stop using her image. Any continued use of her image constitutes a willful violation and subjects DermaCare to punitive damages.

98. Skeldon's image being used to support DermaCare, when she actively works as a salesman for another Company, caused Skeldon harm.

WHEREFORE, Skeldon respectfully requests judgment in her favor and the following relief:

    a.   Injunctive relief against DermaCare using Skeldon's identity;

    b.   Award statutory damages of $1,000 per violation;

    c.   Award Skeldon's costs and reasonable attorneys' fees;

    d.   Award emotional distress damages; and

    e.   Grant such other and further relief as this Court deems just and proper.


Respectfully submitted,

**NEALY L. SKELDON,**

By: */s/ Thomas C. Koessl*
    One of Her Attorneys


Thomas C. Koessl (ARDC #6239337)
Hilarie M. Carhill (ARDC #6340312)
WILLIAMS, BAX & SALTZMAN, P.C
221 N. LaSalle St., Ste. 3700
Chicago, Illinois 60601
P: (312) 372-3311
koessl@wbs-law.com
carhill@wbs-law.com

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on July 31, 2025, the foregoing **Plaintiff's First Amended Complaint** was served on Defendant's counsel via email, at: richard.winter@hklaw.com and william.ringhofer@hklaw.com.

                                           */s/ Hilarie M. Carhill*

# EXHIBIT A

**DermaCare USA Corporation, d/b/a DermaConcepts**
168 Industrial Drive, Building One
Mashpee, MA 02649

May 6, 2013

Nealy Skeldon
1707 North Artesian #2S
Chicago. IL 60647

nealys@hotmail.com

Re:    Offer of Employment at DermaCare USA Corporation, d/b/a DermaConcepts

Dear Nealy:

This letter is to confirm the terms of the offer of employment of your services by DermaCare USA Corporation, a Massachusetts corporation, d/b/a DermaConcepts ("DermaCare" or the "Company" herein). Should you accept this offer, your position and title at the Company is to be Regional Account Manager and your employment services would commence on June 1, 2013. The compensation and other terms of your employment are set forth below and on **Exhibit A** hereto. Please note that, until accepted by you, these terms are subject to change at the Company's discretion.

1. **Description of Employment Services**. During your employment with the Company you will provide your full-time services to the Company, on an exclusive basis. As an employee of DermaCare you shall promote the product offerings of the Company and its affiliates to those prospective buyers and National Accounts and in the territory designated by the Company and perform such other obligations and related services as may be required by the Company and/or which may be incidental to your employment. You shall serve under the direction of the President of the Company or her designee(s).

2. **Compensation; Payment**. During the term of your employment you shall be compensated with the following Base Salary and contingent Draw/Commission:

(a) from the commencement of employment with an initial base salary rate of Six Thousand Three Hundred Dollars (US $6,300) per month and a monthly commission of 6% on all sales up to $20,000 per month, 8% on all monthly sales between $20,001 and $40,000; and 10% on all monthly sales above $40,001. For the first twelve months , your sales commission will be no less than Five Hundred Dollars (US $500) per month, and

(b) Sales sale be defined as "Net proceeds from products or devices" and shall not include amounts paid by a buyer of such product for shipping or other services provided by the Company. Any product returns or similar event resulting in the Company returning any payment received for the payment of products shall result in the Company recalculating the Commission and adjustments to the amount paid and to be paid to you shall be made to reflect such adjustments.

Nealy Skeldon

1

June 1, 2013
Page 2

(c) In addition to the Base Salary and Commission you shall also be entitled to the other bonus payments, if any, identified on **Exhibit A** hereto.

d) The Base Salary shall be paid in arrears and in accordance with the Company's normal payroll practices, but in installments made no less frequently than twice per month. Commissions will be paid on the 15th of the month following the conclusion of the prior month.

(e) The administration of the Company's obligations to you as an employee and the determination of amounts and timing of payments due to you (to the extent that such amounts are subject to calculation, shall be in the sole discretion of the Company. Without limiting the foregoing, federal, state, and local withholding, social security, and other appropriate taxes shall be deducted from all compensation paid to, or provided by the Company for, you as and to the extent required by law.

3.      **Employee Benefits.** You shall be entitled to those benefits and plans described on **Exhibit A** hereto, subject to any eligibility requirements and other terms and conditions of such plans and as such plans may, in the sole discretion of the Company, be modified from time to time.

4.      **Term.** It is currently the desire of the Company so long as you are performing your job satisfactorily.

5. **Work Schedule; Holidays and Vacation.** Your work schedule as an employee shall be Monday through Friday, with nights and weekends for travel and trainings (for special events and meetings) on an as-needed basis. You shall be entitled to fifteen (15) days of vacation per calendar year, to be taken at such time or times as are mutually agreed upon, pro rata for any partial year, and which shall accrue pro rata per month for the time that you are employed with the Company, and may not to be carried over from year to year. You shall also be entitled to certain federal US holidays to the extent observed by the Company.

6.      **Authority; Expenses.** During the term of your employment with the Company you shall have certain limited authority to represent and enter into agreements on behalf of the Company. The foregoing notwithstanding, without the prior written consent of the President of the Company in each instance, you shall not be permitted to (a) incur any single expense in excess One Hundred Dollars ($100), (b) incur any expenses which aggregate to more than Five Hundred Dollars $500 in any sixty (60) day period, and/or (c) make any commitment on behalf of the Company which extends beyond ninety (90) days. Expenses submitted for reimbursement and approved by the Company shall be paid with two weeks of being submitted with appropriate supporting documentation to the Company. You shall defend, indemnify and hold the Company harmless from any and all claims or damages resulting from any failure to adhere to these standards relating to your employment with the Company.

2

Nealy Skeldon
June 1, 2013
Page 3


To accept this employment offer please countersign and return a copy of this letter to me in
the space proved below. In the event that you accept employment with the Company, and as a
condition to the Company's obligations under this letter, you will also be required to sign the
Company's Employee Confidentiality Agreement and the Company's Non-Solicitation and Non-
Competition Agreement, copies of which have also been delivered to you by the Company. In the
event that we do receive acceptance of this offer of employment by May 15, 2013, the Company
reserves the right to withdraw this offer.

Sincerely,
DermaCare USA Corporation

By: _____

Carol S. Trow, President

Agreed and Accepted:

_____
Nealy Skeldon

Dated: May ___, 2013

3

Exhibit A

Nealy Skeldon Employment Offer Letter

**Profit Sharing:**    An amount equal to 3% of the compensation paid to you will be placed into a safe harbor account to be paid in accordance with the Company policy established for such account.

**Insurances:**

**Health**    If you elect to be insured through the Company, then, so long as you are employed by the Company, the Company shall pay a maximum of fifty percent (50%) of individual health care premium due in connection with your insurance, to be paid by you for making such election, such payment to be made by the Company to the Company's employee health insurance carrier.

**Life Insurance**    The Company shall purchase life insurance on your life for an amount equal to one times what the Company estimates your earnings but not to exceed $100,000, and shall make your designee the beneficiary on such life insurance policy, provided, however, that no such insurance shall exist until such policy is issued by the carrier designated by the Company.

Long term disability The Company shall make available to you, at your cost, long term disability insurance, which terms shall provide that you're the beneficiary.

**Automobile:**    Commencing June 1, 2013, the Company shall provide you with a $550 per month car allowance to cover all automobile expenses.

**Cell Phone**    A $100 flat allowance for all cell phone expenses.

**Administrative Support**: You shall be assigned an administrative support person to assist you, provided, however, that such person shall not be exclusive to you.

**Bonus Incentives:**

Bonus    The Company shall pay you $1,000 for the execution of this employment offer letter, the Non-solicitation and

4

Non-competition Agreement and the Confidentiality Agreement, each in the form prescribed the Company; such amount to be paid to you three (3) months following the commencement of your employment.

New Accounts    Following the commencement of your employment term, for every new client account opened by the Company as a result of your services (as determined by the Company), you will be paid a bonus of $250. A new account is defined as having a minimum opening order of $1,500.

New Accounts    If you open 20 new accounts in your first 12 months of employment, you will be paid an additional bonus of $2,500. A new account for this bonus is defined as averaging no less than $1,000 per month in purchases for 12 months.

Total Sales Bonus    If your sales revenue for your first 12 months equals $250,000 or more you will be paid a one-time bonus of $5,000.

**Territory**    Your principle sales territory will consist of Chicago to North Milwaukee; Milwaukee West to Madison, WI; Madison, WI back to the Chicago Western Suburbs and immediate environs of those areas. From time to time, the Company may ask you to cover additional leads outside of this region.

(Rest of Page Purposely Blank)

5

# EXHIBIT B

NON-SOLICITATION AND NON-COMPETITION AGREEMENT

**THIS NON-SOLICITATION AND NON-COMPETITION AGREEMENT** (this "Agreement") is made and entered into as of May 6, 2013, by and between **DermaCare USA Corporation**, a Massachusetts corporation dba DermaConcepts (the "Company"), and **Nealy Skeldon**, an individual with an address set forth on the signature page hereto (the "Employee").

**WHEREAS**, in consideration of the employment of the Employee by the Company (or if already employed, Employee's continued employment by the Company), Employee agreed to enter into a non-competition and non-solicitation Agreement in favor of the Company.

**NOW, THEREFORE**, in consideration of the premises and the covenants and agreements herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.  Covenants not to Compete and not to Solicit.

    (a)  Employee shall not, directly or indirectly, during the period in which Employee is an employee of the Company: (i) act in the employ of or engage in the rendering of any services or the representation of any services in competition with the service provided by the Company; or (ii) offer Employee's services, either directly or through any other person or business, except through the Company.

    (b)  From and after the date of this Agreement and for a period of twenty-four (24) months following the time at which Employee ceases (for any reason) to be an employee of the Company (the "Restricted Period"), Employee shall not render Employee's services, directly or indirectly, to any third party to which the Company has provided products or services within the twelve (12) months prior to termination of Employee's employment with the Company, nor to any third party prospective client of the Company with whom the Company was in meaningful negotiations for providing the Company's products or services at the time of the termination of Employee's employment with the Company.

    (c)  From and after the date of this Agreement and for a period continuing through the Restricted Period, Employee shall not, directly or indirectly, whether individually or as principal, partner, agent, member, employer, consultant, stockholder, joint venturer, or investor, or as a director, officer, or manager of any corporation or association or other entity, or in any other manner or capacity whatsoever, (i) divert or attempt to divert from the Company any business with any customer or account with which Employee had any contact or association, which was under the supervision of Employee, or the identity of which was learned by Employee as a result of Employee's association with the Company, (ii) induce any third party transacting business with the Company to terminate his, her or its relationship or association with the Company, or (iii) induce or cause any employee of the Company or third party providing services or product to the Company to leave the employ of the Company or to cease providing services or product to the Company.

    (d)  The Restricted Period shall be extended by a period of time equal to that period of time during which Employee is in violation of any of the provisions of this Section 1.

2.  Other Remedies; Notification of Employee's Activities. Employee acknowledges and agrees that the Company's remedies at law for Employee's violation of any of the terms or provisions of Section 1 hereof will be inadequate, and that the harm caused thereby will be irreparable. Accordingly, Employee expressly agrees that in the event of any such violation, the Company shall

be entitled to equitable and other relief in addition to any recovery of damages, without the necessity of posting any bond. In addition, Employee hereby consents to the Company's notification of any third parties, including, without limitation, any employer or prospective employer of Employee, of the existence and terms of this Agreement. Following termination of Employee's employment with the Company, and during the Restricted Period, Employee shall notify Company of each company or business to which Employee provides his services. The foregoing notwithstanding, the rights and remedies of the Company in this Agreement shall be in addition to, and not in lieu of, any other rights and remedies that the Company may have in equity or under applicable law.

3.      Reasonableness of the Agreement. Employee believes that the covenants and agreements contained in this Agreement are reasonable and fair in all respects, and are necessary to protect the interests of the Company. Employee further acknowledges and agrees that in the event of the termination of employment with the Company for any reason whatsoever, with or without cause, Employee's experience and capabilities are such that Employee can obtain employment, and that enforcement of this Agreement by injunction will not prevent Employee from earning a livelihood or impose any undue hardship, economic or otherwise. However, in the event that any one or more of the provisions or parts of a provision contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality of unenforceability shall not affect any other provision or part of a provision of this Agreement in that jurisdiction or any other jurisdiction, but this Agreement shall be reformed and construed in any such jurisdiction as if such invalid or illegal or unenforceable provision or such part of a provision had never been contained herein, and such provision or part shall be reformed to make it valid, legal and enforceable to the maximum extent permitted in such jurisdiction.

4.      Counterparts. This Agreement may be executed in counterparts. Each counterpart, including a signature page executed by each of the parties hereto, shall be an original counterpart of this Agreement, but all of such counterparts together shall constitute one instrument. Any signatures transmitted in a pdf file over the internet or by facsimile shall be deemed to be original signatures for all purposes.

5.      Successors and Assigns. Company may assign its rights under this Agreement to any successor to its business or assets. The obligations of Employee hereunder shall be personal to and not assignable by Employee. This Agreement shall be binding upon and inure to the benefit of Company and Employee and their respective legal representatives, successors and permitted assigns.

6.      Beneficiaries. The Company's current and future parent company, subsidiaries and affiliates, shall be entitled to the same rights and benefits under this Agreement, as if such parent, subsidiary or affiliate entered into this Agreement directly with Employee.

7.      Notices. Any notice, request, instruction or other document to be given or served hereunder shall be in writing and, except as otherwise provided for herein, shall be personally delivered or dispatched by certified mail, return receipt requested or by a reputable delivery services, such as Federal Express, all with postage or delivery charges prepaid and with proof of delivery, to the addresses of the parties as they appear in this Agreement or to such other address as may be specified by a party to the other party by notice given in the manner herein provided. Such notice shall be deemed delivered three (3) business days after being properly dispatched. A business day is any Monday through Friday on which first class U.S. Mail is delivered in Boston, Massachusetts. Any notice to Company shall be sent to: DermaCare USA Corporation, 168 Industrial Drive, Mashpee, MA 02649, Attn: Carol S Trow, President. Any notice to Employee shall be sent to the address of Employee on the signature page hereto.

- 2 -

8.    Captions. The captions and headings in the paragraphs of this Agreement are inserted only for convenience and shall not constitute a part hereof.

9.    Continued Employment. This Agreement is not, and shall not be construed in any way as giving Employee any right to continue to work with or at the Company.

10.    Governing Law; Waiver of Trial by Jury; Service. All rights and obligations hereunder shall be governed by the laws of the Commonwealth of Massachusetts applicable to agreements performed wholly within said Commonwealth. Each party hereby consents the personal jurisdiction of the courts located within the Commonwealth of Massachusetts. To the extent permitted by law, Employee hereby waives any right it may have to a trial by jury in any action or proceeding of any kind or nature, in any court in which an action may be commenced, arising out of or in connection with this Agreement. To the extent permitted by law, Employee hereby waives personal service of the summons and complaint or other process of the papers issued therein and agrees that service may be made by registered or certified mail.

11.    Costs and Attorney's Fees. In the event of any breach or violation of this Agreement or threatened breach or violation of this Agreement by Employee, Company shall be entitled to recover from Employee Company's reasonable costs of enforcing its rights under this Agreement, including its reasonable attorneys' fees.

12.    Pronouns and Plurals. Words of number and gender may be read as masculine, feminine, neuter, singular or plural, as required by the context.

13.    Entire Agreement. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and, except for the Employment Agreement, there are no understandings or agreements relative hereto which are not fully expressed herein. All prior agreements with respect to the subject matter of this Agreement are superseded by this Agreement. No amendment to or waiver or discharge of this Agreement will be valid unless in writing and signed by both of the parties hereto.

        IN WITNESS WHEREOF, the parties have executed this instrument under seal as of the day and year first above written.

**Employee:**                                          **DermaCare USA Corporation**

Nealy Skeldon                          By: _____

**Employee Name and Address:**          Its: President
**Nealy Skeldon**
**1707 North Artesian # 2S**
**Chicago, IL 60647**