**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEALY L. SKELDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-06078 |
| | ) | |
| DERMACARE USA Corporation d/b/a | ) | District Judge Joan B. Gottschall |
| DERMACONCEPTS, | ) | Magistrate Judge Jeffrey T. Gilbert |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S ANSWER AND DEFENSES TO
PLAINTIFF'S FIRST AMENDED COMPLAINT AND COUNTERCLAIM**

Defendant DermaCare USA Corporation d/b/a DermaConcepts ("DermaConcepts")

answers Plaintiff Nealy L. Skeldon's First Amended Complaint ("FAC") as follows:

1.      Skeldon worked as a Regional Account Manager employee for DermaCare from June 2013 through March 31, 2025.

**ANSWER**: Admitted.

2.      Skeldon's principal sales territory included all of Illinois, Wisconsin, and Minnesota.

**ANSWER**: Admitted.

3.      Throughout her employment with DermaConcepts, Skeldon was a citizen of the State of Illinois and she worked for DermaCare in Illinois.

**ANSWER**: DermaConcepts is without knowledge or information sufficient to form a belief as to Plaintiff's citizenship throughout her employment with DermaConcepts and therefore denies the allegation. Further answering, DermaConcepts admits that Plaintiff represented to DermaConcepts that she worked for it while located in Illinois.

4.      Skeldon is a citizen of the State of Illinois.

**ANSWER**: DermaConcepts is without knowledge or information sufficient to form a belief as to Plaintiff's citizenship and therefore denies the allegation.

5.      DermaCare is a Massachusetts corporation that conducts substantial business in Illinois.

**ANSWER**: DermaConcepts admits that it is a Massachusetts corporation but denies that it conducts "substantial business in Illinois."

6.      Venue is proper in this Court under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is diversity of citizenship.

**ANSWER**: DermaConcepts denies that 28 U.S.C. § 1332(a)(2) is related to venue.

7.      On May 6, 2013, DermaCare extended a formal employment contract to Skeldon, offering her the position of Regional Account Manager and specifying that her compensation would include a base salary, a tiered commission structure based on her monthly sales, a bonus for each new client account, and additional bonuses for specific sales milestones. *See* **Exhibit A**, May 6, 2013 Employment Contract.

**ANSWER**: DermaConcepts admits that it sent Plaintiff an offer of employment letter dated May 6, 2013; and that such letter offered Plaintiff the position of "Regional Account Manager," a base salary, commissions based on monthly sales, new account bonuses, and a one-time total sales bonus during Plaintiff's first 12 months of employment.

8.      Also on May 6, 2013, DermaCare required Skeldon to sign a Non-Solicitation and Non-Competition Agreement as a condition of her employment. *See* **Exhibit B**, May 6, 2013 Non-Solicitation and Non-Competition Agreement.

**ANSWER**: Admitted.

9.      At all times relevant to the Complaint, Robert Lewis Trow was the President and/or Owner of DermaCare.

**ANSWER**: Admitted.

10.      At all times relevant to the Complaint, Carol Smira Trow was the Owner and/or executive of DermaCare.

**ANSWER**: DermaConcepts admits only that at all relevant times, Carol Smira Trow was one of the owners of DermaConcepts and was an executive at DermaConcepts.

2

11.     At all times relevant to the Complaint, Michael Lucich was the Controller and/or General Manager of DermaCare.

**ANSWER**: Admitted.

12.     At all times relevant to the Complaint, Brittany Pike was the Director of Sales Operations of DermaCare.

**ANSWER**: Admitted.

13.     In early 2022, Skeldon was identified as a witness to Title VII violations in a lawsuit filed against DermaCare by another employee. Skeldon had no knowledge that she was being identified as a witness in that federal lawsuit.

**ANSWER**: DermaConcepts admits that Plaintiff was identified in a federal court complaint filed in 2022 by a former DermaConcepts employee. Further answering, DermaConcepts is without knowledge or information sufficient to form a belief as to the allegation regarding Plaintiff's knowledge of such lawsuit and therefore denies the allegations.

14.     Skeldon experienced emotional distress as a result of DermaCare's actions.

**ANSWER**: Denied.

15.     Beginning in or around July of 2022, DermaCare began denying Ms. Skeldon's legitimate business expense reimbursements, including client entertainment, travel expenses, and marketing materials.

**ANSWER**: Denied.

16.     Many of the business expenses referenced in Paragraph 15 were made pursuant to Company management's direction, or DermaCare's Standard Operating Procedure, but were nonetheless denied for the first time in years.

**ANSWER**: Denied.

17.     During the same time period, DermaCare approved other employees' comparable business expenses and in some cases much more extensive reimbursements, such as DermaCare employee Carrie Dodson's personal and family travel expenses.

**ANSWER**: Denied.

18.     Ms. Skeldon was forced to use her personal money to pay for reimbursable business expenses, amounting to thousands of dollars of expenses.

**ANSWER**: Denied.

3

19. When DermaCare reimbursed clients for hotel expenses related to training events, DermaCare would deduct these hotel expenses from Skeldon's monthly sales totals.

**ANSWER**: Denied.

20. Additionally, DermaCare improperly deducted shipping charges from Skeldon's sales totals.

**ANSWER**: Denied.

21. In total, DermaCare improperly deducted $14,376.32 from Skeldon's sales totals, resulting in the loss of $1,346.73 commissions.

**ANSWER**: Denied.

22. Skeldon did not agree to these deductions from her commission, or authorize them in writing.

**ANSWER**: Denied.

23. DermaCare had no legal basis to make these hotel fee or shipping fee deductions from Skeldon's commission.

**ANSWER**: Denied.

24. DermaCare should have been responsible for these hotel and shipping fees as marketing expenses.

**ANSWER**: Denied.

### III. DermaCare's Purposeful Miscalculation of New Account Bonuses

25. In October of 2023, Skeldon discovered that Lucich had been underpaying her non-discretionary New Account Bonuses by manipulating the formulas used to calculate the earned bonuses.

**ANSWER**: Denied.

26. Instead of deducting commissions at the contractually specified base rate of 6.5%, Lucich was applying a 10% deduction rate that resulted in a smaller bonus payout.

**ANSWER**: Denied.

27. Lucich's deliberate miscalculation of Skeldon's bonuses constitutes wage theft.

**ANSWER**: Denied.

28.     Skeldon discovered that she was underpaid for the following New Account bonuses that she generated: $4,000 for the Forever Young Med Spa account; $948.82 for the SpaDerma account; and $1,062.22 for the AST account.

**ANSWER**: Denied.

29.     Skeldon complained and was able to force Lucich to correct the bonus underpayment errors noted in paragraph 28, related to underpayments in 2023, but only after a multitude of tense emails with Lucich.

**ANSWER**: Denied.

30.     When Skeldon requested that Lucich review, or allow Skeldon to review, the 2021 and 2022 bonus calculations for similar errors, Lucich retaliated and refused to investigate or allow Skeldon to investigate, and ceased all communication on the topic.

**ANSWER**: Denied.

31.     Additionally, under Skeldon's employment agreement she was entitled to a nondiscretionary $250.00 bonus for every new client account with a minimum order of $1,500. *See* **Exhibit A**.

**ANSWER**: DermaConcepts admits only that Exhibit A to the FAC states that "for every new client account opened by [DermaConcepts] as a result of [Plaintiff's] services (as determined by [DermaConcepts]), [Plainitff] will be paid a bonus of $250. A new account is defined as having a minimum opening order of $1,500. Further answering, DermaConcepts denies the remaining allegations of this paragraph.

32.     Skeldon calculated that between 2014-2025, she opened at least 89 qualifying new accounts for which DermaCare did not pay her the $250.00 bonus, totaling $22,250.00 of unpaid bonuses.

**ANSWER**: Denied.

33.     In 2022, DermaConcepts made intentional operational errors so that a number of sales were not credited to Skeldon's account, thereby depressing her apparent record sales totals and excluding Skeldon from the Growth Bonus.

**ANSWER**: Denied.

34.     Skeldon identified the errors and requested that her sales totals be corrected, but DermaCare refused to correct the errors.

5

**ANSWER**: Denied.

35. Additionally, DermaCare improperly calculated Skeldon's Growth Bonuses in 2021, 2022, and 2023.

**ANSWER**: Denied.

36. DermaCare's Growth Bonus plans explicitly stated that growth bonus calculations should be based on product sales only, excluding device sales.

**ANSWER**: Denied.

37. But DermaCare improperly included device sales in Skeldon's growth targets, thus artificially inflating the targets and making them harder to achieve.

**ANSWER**: Denied.

38. Using the correct calculation of product sales for both the base year and the performance year, Skeldon should have been paid growth bonuses of: $9,949.15 in 2021; $2,465.47 in 2022; and $4,450.64 in 2023.

**ANSWER**: Denied.

39. Altogether, Skeldon was damaged $16,865.26 of unpaid growth bonuses between 2021-2023.

**ANSWER**: Denied.

40. Skeldon established a lucrative partnership between DermaCare and the American Med Spa Association ("AmSpa") in 2015, creating national lead generation of sales.

**ANSWER**: Denied.

41. But DermaCare restricted Skeldon so that she could only handle leads from AmSpa within her assigned territory, as part of its retaliation against her.

**ANSWER**: Denied.

42. Meanwhile, DermaCare allowed a comparable employee to handle nationwide leads in a similar partnership that she established. Specifically, DermaCare's Seattle Business Development Manager, Kristin Louise Sabin, was allowed to handle nationwide leads regarding a partnership that Sabin established with Lori Crete.

**ANSWER**: Denied.

43. Once the leads become accounts through placing an opening order, Ms. Sabin receives a sizeable commission on the order, then the account is handed over to the local representative.

6

**ANSWER**: Denied.

44.     Skeldon requested the same treatment that DermaCare extended to Sabin, but DermaCare refused to allow Skeldon to handle nationwide leads from AmSpa.

**ANSWER**: Denied.

45.     DermaCare's decision to deny allowing Skeldon to handle nationwide leads from AmSpa diminished Skeldon's commission opportunities over the course of several years.

**ANSWER**: Denied.

**IV.     DermaCare's Gratis Program Error**

46.     In November 2023, DermaCare erroneously applied its gratis (free product) program to already discounted Holiday Kits, in violation of the program's own terms, and in retaliation for Skeldon's complaints.

**ANSWER**: Denied.

47.     This error resulted in Skeldon losing sales of approximately $5,500 and commissions from the Holiday Kits.

**ANSWER**: Denied.

48.     When Skeldon identified the error and requested compensation for the lost commissions, DermaCare refused to compensate her for the resulting losses.

**ANSWER**: Denied.

**V.     DermaCare's Baseless Performance Criticism/Gaslighting and Disproportionately High Sales Goals for Skeldon in 2025**

49.     From July 2022 through February of 2025, Rob Trow began providing regular feedback to Skeldon indicating that she was failing to meet sales metrics and performing worse than her peers.

**ANSWER**: DermaConcepts admits only that Plaintiff was provided with feedback

regarding her sales performance. DermaConcepts denies the remaining allegations of this

paragraph.

50.     Rob Trow's comments were knowingly false, made in bad faith in retaliation for Skeldon's complaints.

**ANSWER**: Denied.

51.    Circa July 22, 2022, Rob Trow emailed Skeldon and admonished her for "negative [sales] growth."

**ANSWER**: DermaConcepts admits only that Plaintiff was provided with feedback regarding her sales performance. DermaConcepts denies the remaining allegations of this paragraph.

52.    Rob Trow's allegation of negative growth was demonstrably false, as Skeldon's product sales through the end of June 2022 showed positive growth of 5.39% ($283,769.70 in 2022, compared to $269,255.20) from the prior year.

**ANSWER**: Denied.

53.    In June of 2024, Rob Trow emailed Skeldon and alleged that she was not "keep[ing] pace with the rest of the sales staff."

**ANSWER**: DermaConcepts admits only that Plaintiff was provided with feedback regarding her sales performance. DermaConcepts denies the remaining allegations of this paragraph.

54.    Rob Trow's allegation was false, as all or nearly all DermaCare sales staff were experiencing negative revenue trends during that period in 2024, and Skeldon's sales decline was among the least severe of all sales staff.

**ANSWER**: Denied.

55.    Rob Trow additionally sent private messages and memes to Skeldon's personal social media accounts, reinforcing that she was in disfavor with him and accusing her of having "negativity" and "attitude."

**ANSWER**: DermaConcepts admits only that Plaintiff was provided with feedback regarding her performance. DermaConcepts denies the remaining allegations of this paragraph.

56.    Carol Trow called Skeldon in 2024 to reprimand Skeldon for noncompliance with Standard Operating Procedures.

**ANSWER**: DermaConcepts admits only that Plaintiff was provided with feedback regarding her performance. DermaConcepts denies the remaining allegations of this paragraph.

57.    During that call, Carol Trow did not allow Skeldon to explain the facts of what happened.

#525589557_v12

**ANSWER**: Denied.

58.     Skeldon had in fact complied with DermaCare's Standard Operating Procedures regarding the incident that Carol Trow called her about, but Carol Trow never acknowledged that her reprimand was wrong or that Skeldon had behaved appropriately.

**ANSWER**: Denied.

59.     In February of 2025, in retaliation for Skeldon's complaints, Pike provided 2025 sales expectations for Skeldon that were disproportionately aggressive and unrealistic, both compared to the sales goals set for the other Business Development Managers, and also compared to sales expectations in Skeldon's previous eleven years with DermaCare.

**ANSWER**: Denied.

60.     The 2025 sales expectations did not adequately account for the historical performance of Skeldon's territory or prevailing market conditions.

**ANSWER**: Denied.

61.     The sales expectations Pike relayed to Skeldon in 2025 were designed to set Skeldon up for failure as part of the retaliatory scheme.

**ANSWER**: Denied.

62.     DermaCare offers paid vacation time at the employee's regular rate of pay.

**ANSWER**: Admitted.

63.     When Skeldon separated from DermaCare on March 31, 2025, she had accrued 340.74 hours of unused vacation time.

**ANSWER**: Denied.

64.     Given Skeldon's hourly rate of $36.97, her accrued vacation time amounted to $12,597.53 in earned wages.

**ANSWER**: Denied.

65.     DermaCare failed to pay Skeldon these earned wages as final compensation, upon her separation from employment.

**ANSWER**: Denied.

9

**Count I: Declaratory Judgment Regarding
Unenforceability of the Non-Competition Agreement**

66.     Skeldon realleges and restates Paragraphs 1-14 of this Complaint as though fully restated here in their entirety.

**ANSWER**: DermaConcepts restates its responses to the preceding allegations of the FAC.

67.     Prior to joining DermaCare, Skeldon worked in the aesthetics industry for more than nine years.

**ANSWER**: DermaConcepts is without knowledge or information sufficient to form a

belief as to the truth of the allegations in this paragraph and therefore denies the allegations.

68.     On or about May 6, 2013, Skeldon signed a "Non-Solicitation and Non-Competition Agreement," (the "Agreement") with DermaCare. *See* **Exhibit B**.

**ANSWER**: Admitted.

69.     As consideration, DermaCare offered $1,000 and employment with DermaCare.

**ANSWER**: DermaConcepts admits only that part of the consideration Plaintiff received

for signing Exhibit B to the FAC was $1,000 and employment.

70.     The Agreement has no geographical limits.

**ANSWER**: Denied.

71.     For two years after Skeldon's departure from DermaCare, the Agreement would prevent Skeldon from rendering services:

**directly or indirectly**, to any third party to which **the Company** has provided products or services within the twelve (12) months prior to termination of Employee's employment with the Company, nor to any third party **prospective clients** of the Company with whom the Company was in meaningful negotiations for providing the Company's products or services at the time of the termination of Employee's employment with the Company."

[emphasis added] *See* **Exhibit B**, Para. 1.(b).

**ANSWER**: DermaConcepts admits only that the quotation from Exhibit B to the FAC is

accurately transcribed.

72.     The limitations identified in Paragraph 71 would apply even if Skeldon had never worked or had contact with these parties, even if she did not know that DermaCare considered these individuals or business to be prospective clients, and even if DermaCare did not successfully

10

#525589557_v12

contract with these prospective clients. Notably, these restrictions are not even limited to DermaCare's industry, or to Skeldon providing services that are in competition with DermaCare—they would prevent Skeldon from providing any types of services to these parties or prospective clients.

**ANSWER**: Denied.

73.     Likewise, for two years after Skeldon's departure from DermaCare, the Agreement would prevent Skeldon from soliciting:

any business with any customer or account with which Employee had **any** contact or association, which was under the supervision of the Employee, **or the identity of which was learned** by Employee as a result of Employee's association with the Company. . .

[emphasis added] *See* **Exhibit B**, para. 1.(c).

**ANSWER**: DermaConcepts admits only that the quotation from Exhibit B to the FAC is

accurately transcribed.

74.     The prohibition identified in Paragraph 73 is not limited in time to customers with whom Skeldon recently worked, or even to customers that Skeldon ever worked with in her twelve-year history with DermaCare. Likewise, it is not limited to current customers of DermaCare, but could extend to any prior customers that DermaCare has had in its history. Neither is it limited by Skeldon's substantive involvement with the customer. Moreover, even if Skeldon did not know any details about the customer's business with DermaCare, such as specific products purchased or rates, simply learning the identity of the customer would prohibit Skeldon from soliciting that customer.

**ANSWER**: Denied.

75.     DermaCare did not enforce the Agreement against another former employee, Bobby Calhoun, who left DermaCare in 2024 to work in medical aesthetics. However, DermaCare represented to Skeldon that DermaCare intends to specifically enforce the Agreement against her.

**ANSWER**: Denied.

76.     Skeldon has experienced ongoing harm by this selective enforcement of the Agreement against her. After separating from DermaCare, Skeldon found employment as a Regional Sales Manager with a company that sells medical-grade skincare products. In her new position, she was assigned sales territory on the south side of Chicago, from North Avenue south through the south and southwestern suburbs. She cannot fully perform her current job duties, including utilizing her professional contacts, under the Agreement's constraints.

**ANSWER**: Denied.

11

77.     If the Agreement is not deemed unenforceable, Skeldon may lose her current position for failure to meet reasonable sales goals.

**ANSWER**: Denied.

78.     Illinois courts consider restrictive covenants reasonable "only if the covenant: (1) is no greater than is required for the protection of legitimate business interest of the employer-promisee (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." See Reliable Fire *Equip. Co. v. Arredondo*, 358 Ill.Dec. 322, 965 N.E.2d 393, 396 (Ill. 2011). For the reasons stated above, the Agreement at issue here is unreasonable and therefore unenforceable, because it is both overbroad and it imposes an undue hardship on Skeldon.

**ANSWER**: DermaConcepts admits that the quotation from the *Reliable Fire Equip. Co. v. Arredondo* case is substantively accurate but denies that Exhibit B attached to the FAC is governed by Illinois law; rather it is governed by Massachusetts law. Further answering, DermaConcepts denies the second sentence of the foregoing paragraph.

WHEREFORE, Skeldon respectfully requests judgment in her favor and against the Defendant, including:

i.      Declare that the May 6, 2013 Non-Solicitation and Non-Competition Agreement is void, unenforceable, and contrary to Illinois law and public policy;

ii.     Permanently enjoin DermaCare from attempting to enforce or asserting any rights under the Agreement;

iii.    Award Ms. Skeldon her costs and reasonable attorneys' fees incurred in bringing this action;

iv.     Award emotional distress damages; and

v.      Grant such other and further relief as this Court deems just and proper.

**ANSWER**: Denied that Plaintiff is entitled to any judgment against DermaConcepts and to any of the relief requested.

### Count II: Breach of Contract

79.     Skeldon realleges and restates Paragraphs 1-65 of this Complaint as though fully restated here in their entirety.

**ANSWER**: DermaConcepts restates its responses to the preceding allegations of the FAC.

#525589557_v12

80.     Skeldon fully performed her obligations under the employment contract she entered into with Dermacare, **Exhibit A**.

**ANSWER**: Denied.

81.     DermaCare materially breached the employment contract by: failing to pay New Account Bonuses for 89 qualifying accounts (totaling $22,250); improperly calculating and underpaying Growth Bonuses for 2021-2023 (totaling $16,865.26); making unauthorized deductions from total sales (amounting to $1,346.7 dollars in lost commissions); refusing to reimburse legitimate business expenses (totaling thousands of dollars); and failing to pay accrued vacation upon separation (totaling $12,597.53).

**ANSWER**: Denied.

WHEREFORE, Skeldon respectfully requests judgment in her favor and the following relief:

      i.     Award all damages for breach of contract;

      ii.    Award Skeldon's costs and attorneys' fees; and

      iii.   Grant such other and further relief as this Court deems just and proper.

**ANSWER**: Denied that Plaintiff is entitled to any judgment against DermaConcepts and to any of the relief requested.

### Count III: Violation of and Retaliation
### Under the Illinois Wage Payment and Collection Act

82.     Skeldon realleges and restates Paragraphs 1-65 of this Complaint as though fully restated here in their entirety.

**ANSWER**: DermaConcepts restates its responses to the preceding allegations of the FAC.

83.     At all relevant times, Skeldon was an employee of DermaCare within the meaning of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1, et seq., operating under a valid employment contract, **Exhibit A**.

**ANSWER**: Denied.

84.     Defendant failed to pay Skeldon her due wages under the IWPCA, including:

    a.    New Account Bonuses for at least 89 qualifying accounts between 2014 and 2025, totaling $22,250;
    b.    Growth Bonuses, totaling $16,865.26 between 2021-2023; and
    c.    Accrued vacation hours totaling $12,597.53.

13

**ANSWER**: Denied.

85.     Additionally, Defendant wrongly deducted $14,376.32 from Skeldon's sales totals for hotel and mailing costs, costing Skeldon $1,346.73 in unpaid commissions.

**ANSWER**: Denied.

86.     Finally, Defendant failed to reimburse Skeldon for all necessary expenditures or losses incurred by Skeldon within the scope of her employment and directly related to services performed for the employer. These necessary expenditures included client entertainment, travel expenses, and marketing materials, and overall cost approximately $3,000.

**ANSWER**: Denied.

87.     Defendant willfully refused to pay Skeldon as provided by the IWPCA, and falsely denied the amount or validity of the amounts owed to Skeldon.

**ANSWER**: Denied.

88.     Additionally, DermaCare retaliated against Skeldon with baseless criticism and disproportionately high sales goals compared to other comparable employees, as well as through materially adverse employment actions impacting Skeldon's current and future wealth, such as disallowing Skeldon from gaining sales leads outside of her assigned territory for the national AmSpa partnership that she generated, erroneously marketing holiday discounted items as free goods and depriving her of approximately $5,500 sales commissions, reducing her commissions to pay fees that DermaCare was responsible for, and failing to reimburse her for legitimate business expenses.

**ANSWER**: Denied.

WHEREFORE, Skeldon respectfully requests judgment in her favor, including:

      i.      Award all damages for violation of the IWPCA;

      ii.     Costs and reasonable attorney's fees;

     iii.    Penalties under the IWPCA;

     iv.    Emotional Distress Damages;

      v.     All legal and equitable relief as may be appropriate; and

     vi.    Grant such other and further relief as this Court deems just and proper.

**ANSWER**: Denied that Plaintiff is entitled to any judgment against DermaConcepts and to any of the relief requested.

**Count IV: Violation of the Illinois Right of Publicity Act**

89.     Skeldon realleges and restates Paragraphs 1-14 [*sic*] of this Complaint as though fully restated here in their entirety.

**ANSWER**: DermaConcepts restates its responses to the preceding allegations of the FAC.

90.     The Illinois Right of Publicity Act, 765 ILCS 1075/1, *et seq.*, prohibits the use of an individual's identity (including any attribute that identifies that individual to an ordinary viewer, including the individual's name, signature, or photograph) for commercial purposes, without written consent.

**ANSWER**: DermaConcepts admits only that this paragraph generally describes certain

aspects of the Illinois Right of Publicity Act.

91.     Following Skeldon's separation on March 31, 2025, DermaCare continued to use her name and identity in commercial marketing communications, promoting its products and services.

**ANSWER**: Denied.

92.     DermaCare sent multiple marketing emails from "Nealy Skeldon," including using her former email address as the "Reply-To" address. On information and belief, these emails were sent to more than 100 industry leaders.

**ANSWER**: Denied.

93.     Skeldon is aware of specific emails that were sent on April 9, 2025, April 16, 2025, April 23, 2025, April 30, 2025, May 7, 2025.

**ANSWER**: Denied.

94.     Skeldon did not provide written consent for DermaCare's continued use of her identity.

**ANSWER**: Denied.

95.     DermaCare's use of Skeldon's identity implied that Skeldon continued to endorse DermaCare and had a continued association with them.

**ANSWER**: Denied.

96.     Under 765 ILCS 107/40, Skeldon is entitled to the greater of actual damages or $1,000 per violation.

**ANSWER**: Denied.

15

#525589557_v12

97. Skeldon provided formal notice on May 9, 2025, that she wanted DermaCare to stop using her image. Any continued use of her image constitutes a willful violation and subjects DermaCare to punitive damages.

**ANSWER**: Denied.

98. Skeldon's image being used to support DermaCare, when she actively works as a salesman for another Company, caused Skeldon harm.

**ANSWER**: Denied.

WHEREFORE, Skeldon respectfully requests judgment in her favor and the following relief:

a. Injunctive relief against DermaCare using Skeldon's identity;

b. Award statutory damages of $1,000 per violation;

c. Award Skeldon's costs and reasonable attorneys' fees;

d. Award emotional distress damages; and

e. Grant such other and further relief as this Court deems just and proper.

**ANSWER**: Denied that Plaintiff is entitled to any judgment against DermaConcepts and to any of the relief requested.

## DEFENSES

DermaConcepts asserts the following defenses to the FAC. DermaConcepts reserves the right to amend and add to these defenses, and to assert any additional counterclaims.

1. Plaintiff's claims are barred, in whole or in part, through failure to state a valid claim for relief.

2. The restrictive covenants Plaintiff agreed to with DermaConcepts as set forth in Exhibit B to the FAC are valid and enforceable.

3. Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate damages, if any.

16

4. To the extent Plaintiff seeks emotional distress damages, any alleged emotional distress was caused by factors other than DermaConcepts' conduct.

5. DermaConcepts' alleged acts and omissions were made in good faith and based on reasonable grounds for believing that the acts and omissions were not unlawful, and were without malice, willfulness, or reckless indifference to any of Plaintiff's state or federally protected rights.

6. If the Court or jury determines that Plaintiff has shown a violation of applicable law, DermaConcepts will show that such action was contrary to its policies and good-faith efforts to comply with said law, such that punitive or similar damages are not recoverable.

7. To the extent Plaintiff has received worker's compensation benefits, medical benefits, or any other income or benefits, DermaConcepts is entitled to an offset from any judgment for such amounts.

8. Plaintiff's claims for relief are barred by the doctrines of estoppel, laches, and waiver.

9. The claims raised in the FAC are barred by the doctrine of unclean hands and Plaintiffs' wrongful conduct.

10. DermaConcepts has fully complied with any and all of its duties under the Illinois Wage Payment and Collection Act and therefore did not violate the Illinois Wage Payment and Collection Act.

11. DermaConcepts has fully complied with any and all of its duties under the Illinois Right of Publicity Act and therefore did not violate Illinois Right of Publicity Act.

## **JURY DEMAND**

DermaConcepts makes a demand for a jury on all claims and issues triable by a jury.

17

## COUNTERCLAIM

DermaCare USA Corporation d/b/a DermaConcepts ("DermaConcepts") alleges against Nealy L. Skeldon ("Counterclaim Defendant") as follows:

1.      Counterclaim Defendant is a former employee of DermaConcepts.

2.      In connection with the start of Counterclaim Defendant's employment with DermaConcepts and in exchange for $1,000 and other consideration, Counterclaim Defendant signed an "Employee Confidentiality Agreement" (the "Confidentiality Agreement"). A true and accurate copy of the Confidentiality Agreement is attached hereto as **Exhibit A**.

3.      The Confidentiality Agreement defines "Confidential Information" as:

> any and all DermaCare proprietary information or materials, including, but not limited to, techniques, methodology, equipment, programs, software, data, data bases, reports, know-how, sources of supp)y, customers, consultants and business plans, including any negative developments which are communicated to, learned of, developed or otherwise acquired by Employee during the Employment Period, or in the course of, or in connection with Employee's employment with DermaCare or in connection with any services Employee provided to DermaCare prior to becoming an employee of DermaCare and/or in contemplation of becoming an employee of DennaCare, as well as information concerning the existence and scope of DermaCare activities and the activities of DermaCare's clientele, including. without limitation, their research, development and marketing activities.

Ex. A at § 1(b).

4.      Further, the Confidentiality Agreement provides that

> Upon termination of the Employment Period or at any other time upon request of DermaCare, Employee shall promptly deliver to DermaCare all physical Confidential Information, including, without limitation, all records, files, memoranda. notes, reports, lists, programs and other documents and items (and all copies or reproduction of such materials) relating to the business of DermaCare and/or to the business of DermaCare Clients.

Ex. A at § 2(c).

18

5.     In connection with her employment, Counterclaim Defendant received a laptop computer for which DermaConcepts ultimately paid (the "Laptop") so that she could perform work for DermaConcepts.

6.     Counterclaim Defendant acknowledged in writing that the Laptop was her "work computer."

7.     DermaConcepts booked the Laptop as an asset on its balance sheet.

8.     As part of her employment with DermaConcepts, Counterclaim Defendant regularly stored Confidential Information on the Laptop.

9.     Counterclaim Defendant resigned her employment from DermaConcepts, effective April 8, 2025.

10.    Following her resignation, Counterclaim Defendant did not return to DermaConcepts the Laptop or the Confidential Information stored on the Laptop.

11.    Upon information and belief, Confidential Information still remains on the Laptop.

12.    DermaConcepts asked Counterclaim Defendant to return the Laptop on multiple occasions, including by letters to her attorney on April 10, 2025 and May 13, 2025.

13.    Counterclaim Defendant did not return the Laptop.

14.    Counterclaim Defendant continues to retain the Laptop.

**COUNT I: Breach of Contract**

15.    DermaConcepts repeats and incorporates by reference the allegations set forth in each of the foregoing paragraphs.

16.    The Confidentiality Agreement is a binding and enforceable contract between DermaConcepts and Counterclaim Defendant.

19

#525589557_v12

17. DermaConcepts fully performed and did not breach its obligations to Counterclaim Defendant under the Confidentiality Agreement.

18. Counterclaim Defendant materially breached the Confidentiality Agreement by failing to return to DermaConcepts both the Laptop and the Confidential Information stored on it.

## COUNT II: Conversion

19. DermaConcepts repeats and incorporates by reference the allegations set forth in each of the foregoing paragraphs.

20. DermaConcepts has a right to the Laptop as it effectively purchased it only so that Counterclaim Defendant could use it in the course of her employment with DermaConcepts.

21. Following her resignation from DermaConcepts, Counterclaim Defendant's control, dominion, and possession of the Laptop became unauthorized and wrongful.

22. DermaConcepts has a right to immediate possession and control of the Laptop, absolutely and unconditionally.

23. DermaConcepts has demanded that Counterclaim Defendant return the Laptop to it and Counterclaim Defendant has not done so.

24. DermaConcepts restates its demand for the return of the Laptop.

## REQUEST FOR RELIEF

WHEREFORE, DermaConcepts respectfully requests judgment in its favor and the following relief:

A. Issue an order requiring Counterclaim Defendant to return the Laptop and any Confidential Information in her possession to DermaConcepts immediately;

B. Award damages to DermaConcepts in an amount to be determined at trial;

C. Award DermaConcepts its costs and attorneys' fees; and

#525589557_v12

D.      Grant such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

DermaConcepts makes a demand for a jury on all claims and issues triable by a jury.


                                                Respectfully submitted,

                                                DERMACARE USA CORPORATION,
                                                d/b/a/ DERMACONCEPTS,

                                                By: /s/ *Richard R. Winter*
                                                        One of Its Attorneys

Richard R. Winter
William A. Ringhofer
HOLLAND & KNIGHT LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
richard.winter@hklaw.com
william.ringhofer@hklaw.com

#525589557_v12